I'd like to reserve two minutes for rebuttal, please. Very well. And first of all, thank you for your patience. I hope you got the notice that I tried to set this for 11 a.m. rather than 8. We did, Your Honor. You did, okay. Thank you. And anyway, we wanted oral argument because of the United States, or the Bond v. United States issue, and that's, well, you, I mean, that's what you're— What are the elements of this crime now, as you understand it? Your Honor, may it please the Court, the elements of the crime here are simple possession here that he knowingly possessed the ricin. And I'd like to focus on the Bond issue as well since that is what the panel is interested. And Mr. Levenderis submits that this Court should vacate his convictions because the District Court erred by upholding the convictions that federalized state-local criminal conduct that should have been punishable by the Ohio Criminal Code. Now, Mr. Levenderis doesn't submit that he did not do anything illegal. Certainly, his criminal conduct is punishable, but the State of Ohio is more than capable of doing so. In fact, if you look at the— You're saying that nowadays with Bond, there's an element of possession of the biological substance, ricin. And before Bond, that might have been sufficient and the only element necessary to prove the case. But now, we've got an additional element, which is that it's a non-local problem. Is that kind of what you're saying? Yes, Your Honor. And if you look at the government's reading of the statute and look at it in a very narrow and literal sense, Mr. Levenderis' conduct certainly meets the criteria of Section 175. But as the Court instructed in Bond, one has to look beyond the statute and look to the legislative history. The Biological Weapons Convention was enacted in order to combat weapons of mass destruction, terrorism, the threats of germ warfare, just as the Chemical Weapons Convention was—that treaty was there to combat those types of concerns as well. Well, it's the problem, though, that in fact, ricin is one of the deadliest and it has been used for terroristic purposes internationally. And if it gets loose in the air, it can do a whole lot more damage than what the situation was in Bond. Certainly, Your Honor. And if there had been more facts in this case to indicate that Mr. Levenderis had intended some type of mass harm plot or something that would engage in mass casualties, terroristic activity, then certainly this— Well, there was some interesting testimony that what he was going to do was set the house on fire and use the ricin to try to keep the firefighters away. But in fact, if it had gotten loose, it certainly was a danger to the firefighters and might have been a danger to the entire neighborhood. So it's not—it's not entirely—I mean, it's not just one person that it's aimed at, as it was in Bond. It has a potential for harm that's much larger than that. I would disagree, Your Honor. On page 185 of the record, it indicates on cross-examination that even the government's experts stated that it could only have harmed 256 people if it had been injected into each of those individuals, that there was, in fact, no danger through inhalation. And again, it's important to point out that Mr. Levenderis had this ricin in his freezer in a coffee can for more than 10 years, that he actually didn't do anything with that ricin, and there was no evidence to indicate— How was he going to use it against the firefighters after he set the house on fire? How would that—he had used the ricin? Well, Your Honor, the government's evidence indicates that he would have set the house on fire, and he was hoping that the firefighters wouldn't enter his house and wouldn't, therefore, stop his suicide. Wasn't he going to hang it from the door or something and let them know that it was ricin and that would keep them out? I believe so. It was an elaborate suicide attempt. I'm not sure how successful it would have been, but he hoped that the firefighters would have understood that ricin was inert at 180 degrees and would, therefore, not have entered the building. But even if he had done so, the Ohio Code provides the appropriate statutes to combat that type of criminal behavior. For example, if that firefighter scenario did, in fact, happen, if he had taken some affirmative steps to actually engage in that elaborate suicide plot, then there are codes in the Ohio Revised Code that would have combated that type of activity. Misconduct at an emergency inducing panic. It's 2917.13 and 2917.31, respectively. If, in fact, as the government alleged, he tried to poison his stepfather by putting that poison in his soup, well, that's just like Carol Ann Bond's activity where she tried to perhaps have a rash for her husband's mistress by putting those type of chemicals on the door and on the mailbox. And the court stated in Bond that every poisoning in the land can't be punishable under these federal statutes. So you reject out of hand the fact that what Levendaris was possessed, retained, as the statute says, was ricin, which is a known terrorist toxin, and that's enough to bring it under Bond. Is that it? I mean, what were the chemicals in Bond? How widely deadly would they have been? Your Honor, the chemicals in Bond used in a different way, for example, put into water supply or used in greater quantity could, in fact, have been lethal. And the court in Bond pointed that out. If Mr. Levendaris had put enough dish detergent in his stepfather's soup, if he had actually done so, that could have killed his stepfather, too. But the testimony was that it certainly would have caused some type of GI discomfort, but it wouldn't have killed him. But even then, an attempted murder statute, an assault statute would have been appropriate. In fact, the Ohio Revised Code 2927.24 has a code for contaminating substance for human consumption with use of a biological substance, such as ricin. And even the mere possession 2917.41, improperly handling infectious agents, that would have been something that the state of Ohio could have chosen to prosecute Mr. Levendaris for, because an infectious agent is defined as a microorganism, such as a virus, a bacterium, or similar agent that can cause death. So almost anything could be a local crime. You know, Bond has been roundly criticized because it's a pretty fudgy sort of an opinion. I mean, what did they mean, and where would you draw the line? Almost anything could be brought under the Ohio statutes. Does that just because it can be prosecuted locally? No, Your Honor. Just because there are concurrent state crimes doesn't necessarily mean that it couldn't be prosecuted under Section 175. However, Bond does try to draw some type of line. There has to be some type of common sense limit to where there's a difference in Carol Ann Bond's actions or Mr. Levendaris's actions and that of a terrorist. And that's by looking at the backdrop of the Biological Weapons Convention. And in fact, when Congress enacted Section 175, it did so with the 1989 Anti-Terrorism Act. The impetus of the act wasn't a suburban man grinding up castor beans in his basement. Instead, it was weapons of mass destruction or mass casualties, terrorism. And there's nothing in the record to indicate that Mr. Levendaris had any of this type of intent. Well, I thought he had the intent as to the firefighters, or at least he may have. Your Honor, he had the intent to kill himself, although it's important to note he never engaged in that type of activity. In fact, he kept that coffee can in his freezer for 10 years. There's evidence of this plot. That involves multiple people. And the question is, is one person not enough for mass injuries? Do you need two? Do you need 10? I mean, Bond doesn't really tell us. I guess one's not enough. And then you also have to look at the motive. I mean, a terrorist, somebody who terrorizes, in Bond, I think he's terrorizing the girlfriend or the, she's terrorizing the, yeah, the girlfriend of the husband. Well, I mean, terrorism can be all kinds of things. I mean, that's the problem with the opinion. The problem I've got with it is, right now, that this Bond local situation, plus the way this case was tried, seems to indicate that just possession is not sufficient. And then the question will be, well, what is the other element that would make it sufficient? And it would seem to me that the other element would have to be intent to use it in some way. That is to say, if you just possess it for fun, you've got it in your refrigerator for 10 years or whatever, and you don't intend to do anything with it, and apparently this case was kind of tried on that basis. In fact, they introduced evidence of two different ways in his imagination he thought he could use it, or he might use it, or even though he had not created for that particular purpose, apparently. So there's some intent problem here the government must have thought existed, otherwise they wouldn't have proved what they want to prove, something they didn't have to prove about intent, if they didn't have to prove it. I'm not sure, Your Honor, and that's something that you would certainly need to ask the government, but knowing possession of the ricin with an intent to use it as a weapon is in Section 175, and there have been appropriate prosecutions for possession and use as a weapon under Section 175, but all of those... You're saying the statute says with intent to use as a weapon? Yes, Your Honor. So there is possession plus an intent element. Well, let me just see if I can clear this up. Wasn't he... There's an A and a B to 175, and the A, it speaks in terms of possession to use as a weapon, or knowingly assist a person to do so. That isn't this case. And then there's B, additional offense, whoever knowingly possesses any biological agent, toxin, etc., that under the circumstances is not reasonably justified by a prophylactic, protected, bona fide research or other peaceful purpose. And I suppose what the government came in and proved was that this was not reasonably justified by a prophylactic, protected, bona fide research or other peaceful purpose. Purpose, isn't that it? Yes, Your Honor, and Mr. Levendaris doesn't concede that the ricin was there for a peaceful purpose. However, he shouldn't face federal prosecution when it goes to a statute that was enacted in order to enact the Biological Weapons Convention that was clearly drafted in order to combat something far different and far from the scope of Mr. Levendaris' local and unremarkable conduct. And the circuits have considered other cases where Section 175 was prosecuted appropriately, and all of those cases have an element of mass harm and of terrorism. For example, in United States v. Hale, when the 11th Circuit considered a case where the defendant mailed what was purported to be the Hantavirus, which is deadly, to a U.S. bankruptcy trustee, in that case, the court analyzed the facts of that case and stated explicitly that in natural parlance that would be referred to as terrorism. What Mr. Levendaris did certainly wouldn't be referred to as terrorism and doesn't even fit within the definition of terrorism within the U.S. Code. In the U.S. Code, the definition is, you know, acts to influence the policy of a government by intimidation or coercion to affect the conduct of government by mass destruction. Those are not the facts of this case. And this court has considered the application of bond in two recent cases. In U.S. v. Tovia, this court considered a case where the defendant had committed the local crime of child abuse, and instead, he was charged and convicted under the federal forced labor statute. And this court, in applying bond, determined that there was a harm to making a presumption that there should be some type of change to the statute. There is some type of harm in upsetting that balance and stripping the police powers away from the state. And in that case, they reversed the conviction because it went beyond that federal forced labor statute's purpose. Also, most recently, just a few weeks ago, in United States v. Callahan, the court considered a similar case, also under the forced labor statute. And in that case, the court went on for several pages describing the egregious facts in that case, involving a minor, and stated that the federal forced labor statute was passed specifically to expand the forms of coercion that could result in forced labor. And in fact, the defendant's charged conduct went to the very heart of Section 1589's concern. Well, the heart of Section 175's concern is the horrors of war, the atrocities of war, weapons of mass destruction, concerns of germ warfare. None of those are apparent in this case. Mr. Levendaris didn't have the intent to do so. And therefore, it goes far beyond the biological weapons convention. You're out of time. You can use your rebuttal now if you want, or you can save it. I'll use my rebuttal. Thank you, Your Honor. You'll save it? Yes. Good afternoon. Thank you, Your Honor, and may it please the Court. Aditya Bamzai, on behalf of the United States. This case arises out of defendant's decision to process and to possess ricin, a highly lethal biological toxin that's capable of killing an adult human with a dose the size of a human. So is a gun. So you know, there are a lot of things that are capable of killing humans, as we know. That's true. This particular biological toxin is capable of killing a human with a dose the size of a few grains of table salt. And so it falls squarely within the heart of Section 175. The Department of Health and Human Services has placed ricin. There's no question that he possessed it. What is the other element that has got to be proved in the case? Well, Your Honor, so we would submit that under a Section 175B charge, no other element would have to be proven, even under bond. But this They tried to prove another element. That is true, Your Honor. You must have had some thought, well, maybe there is another element. That's true. And it's because under 175A, which is the provision that's at issue on this particular appeal, there's an element that says that the defendant has to possess for use as a weapon. And as a result, the government put forward evidence before the jury that defendant did, in fact, possess this ricin for use as a weapon. And you put on two different theories about how he thought of using the weapon, that is, the ricin. One, to put it in the soup of his stepfather. One. Number two, to commit suicide and burn the house down and warn off the fire department. That's correct, Your Honor. Those were among the pieces of evidence that the jury heard. There was also evidence from defendant Selmay that he may have somehow dispersed the ricin in a crowd on the street or something of that nature. So there were various different It wouldn't have worked if he had put it in the soup, right? Well, Your Honor, you're correct that with this particular mix of ricin, it wouldn't have been fatal if ingested. It would have been fatal on the evidence that was before the jury if injected or inhaled. And there's an issue that is mentioned in the briefs about whether it would have been fatal or lethal if inhaled. And that really goes to One of the problems here is the jury got two or three theories of intent. Intent to do what? And one of the intents to put it in the soup was not possible. So we don't know on what basis this jury returned its verdict of guilt. Which intent did the jury find? Well, Your Honor, I don't know if that really makes that much of a difference because the statute requires us to prove that the defendant possessed ricin and that it was possessed for use as a weapon. And we met both. We've got a lot of case law that says where a jury is left with two different theories of a crime, one of which is not a crime, yet they are instructed with respect to the theory of the case, and they are allowed, would be allowed, and the jury would be allowed in this case to find the intent in connection with the soup. And the case law is where you have a theory that works and a theory that doesn't work. That's a problem. Your Honor, so my response to that would be that regardless of how defendant planned to use the, regardless of whether the way in which defendant planned to use the ricin, whether that would actually be successful, he did in fact plan to use it for use as a weapon, and he did in fact have the ricin. So under either theory of the case, we have met our burden pursuant to Section 175A. You're saying that anything some fellow conceives of in his imagination that he could do with the Your Honor, I would just revert to the language of the statute, which is that we have to show that the defendant possessed the ricin for use as a weapon, and the fact that the way in which he planned to use it as a weapon perhaps would not have succeeded under one of the theories that was presented to the jury, that is not ultimately relevant to whether he actually committed the crime. You don't have to prove success to prove intent, is that what you're saying? That's correct, Your Honor. Now I would just, I'm sorry. Was there a superseding, yeah there was, a superseding indictment? Yes. Yes, Your Honor, and if you're asking. But the original indictment accused him only under 175B, so you all came back and added 175A. Yes, Your Honor. What did the jury find him guilty of? The jury found him guilty of both charges, and the district judge dismissed one of the charges after trial as a lesser included offense of the other, and this may go to your question, Your Honor, that you had to my friend on the other side about what's the difference between section 175A and 175B, and I would point the court to the language in 175A, which has this for use as a weapon text, which is not included in 175B, and 175B has an exclusion for a biological agent or toxin that is in its, quote, naturally occurring environment, and so essentially what Congress was trying to do is in 175A, let's say you have a stockpile of castor beans, but you, the government can show that you possess them for use as a weapon, that is a crime under 175A, under 175B, let's say you have the castor beans, it's not a crime because it's in its naturally occurring environment, so there's a distinction between these two statutes, and in this case, defendant was guilty under both. And what happened to the lying to the FBI charge, was that an acquittal? No, Your Honor, he was convicted of flying to the FBI, that's at stake in this appealing sense that the Miranda charges. That's what I thought, but nobody's mentioned it, I just wondered. What does the Bond case do to this? Well, Your Honor, I think that the answer to that is that Bond is quite different from this case, and it's different in several respects. One respect is the statutes that are at stake in either case, section 229, which is the Chemical Weapons Convention statute at stake in Bond, and section 175A, which is the Biological Weapons Convention statute at stake here. One difference between the two is the different definitions for toxic chemicals and the Chemical Weapons Convention statute. You got the same basic kind of pattern that exists with chemical weapons and with a biological weapon, don't you? Well, Your Honor, the Biological Weapons provision just has a definition of toxin that is different from the one in the Chemical Weapons Convention. It's different, but I mean, the purpose of it is the same, isn't it? Well, the second, so that's just one difference on the language. The second difference that I would point to is the for use as a weapon language, which is in the Biological Weapons Convention implementing statute, and not in the Chemical Weapons Convention implementing statute. And a third is that the Biological Weapons Convention implementing statute was cited by the Supreme Court in Raich as an appropriate way in which Congress can prohibit the possession of an article of interstate commerce. And so this is just stuff on the statutes and whether... A chemical weapon would be a matter in the same way of an article in interstate commerce. You got to get the chemicals in the interstate commerce. Well, so assuming that the limiting construction that the court gave in Bond applies to the Biological Weapons Convention's implementing statute, there are nevertheless a number of differences on the facts in this case. Criminal Division hasn't said to the United States Attorney's offices how you should try to deal with Criminal Division whenever it gets to the Supreme Court about what to say here on this biological. You don't have anything like that. It's up to you to come up with something. Your Honor, I'm not at liberty, unfortunately, to discuss the internal advice that the Criminal Division may or may not have given. But nevertheless, this provision... Why not? I'm asking you a question as a judge, what the position of the United States is. Oh, absolutely. You're not allowed to tell me? No, what I meant to say is that whether the Criminal Division had advised U.S. Attorney's offices, however, the position in our brief is the position of the United States. And that is that the facts of this case are very different from the case in Bond. And there are a number of differences. So first, I would point to the fact that in Bond, and this is in the opinion, the court said that the case before it was, quote, unusual, and its analysis was therefore, quote, appropriately limited. So that strongly indicates that the court did not intend that the lower court should extend the analysis to inapposite cases. Second, Bond involved two chemicals, and they are potassium dichromate and 10-chlorophenoxyacin, that are available for potentially peaceful purposes, and they don't have the same lethal capability as ricin. Bond made clear that, quote, extremely dangerous substances, and ricin is clearly an extremely dangerous substance, that would fall within the scope of 229. So we submit that for the same reason, extremely dangerous substances, when possessed, that falls within the scope of Section 175A. And then finally, I'd point out that the court in Bond cited cases with approval, in which it believed that Section 229 could properly be applied, and those cases include the Eighth Circuit's opinion in the Gone case, which is cited in our brief. And in that case, if you look at the facts of the case, the Eighth Circuit upheld the conclusion... Let me ask you a question. I just want to be sure I understand the government's position. Do you have to prove that the ricin is possessed with intent to use it as a weapon? Well, Your Honor, the language of the statute says for use as a weapon, and whether there's some sort of difference between intent to use as a weapon and... There was used as a weapon, so the question then is, was it possessed with intent to use it as a weapon? If it's not used as a weapon, then the question is one of intent, right? So do you have to show that? That's correct, Your Honor. And the only reason why I'm hesitating before answering with a straight up yes is just that intent sometimes means something specific under the criminal law. And I didn't want to suggest that the language was used in that very technical way. General intent, specific intent. I guess this is a specific intent case. You're absolutely right that there is an intent style component in 175A, and that's for use as a weapon text. And so I just wanted to point out that the Gahn case seems very much on point here because in that case, the defendant possessed potassium cyanide with a plan to commit suicide and potentially kill other people. Why wasn't this charge brought under 175B? It was brought under both, Your Honor. Both? Yes, that's correct. And the jury convicted defendant of both. The district judge after trial held that the second charge was a lesser included offense of the first. That was an issue that the government disputed, and it's a resolution the government doesn't agree with, but the government elected not to appeal that to this court. All right. Any further questions? If the court has no further questions, thank you. Two minutes rebuttal. Thank you, Your Honor. Just briefly, the Chemical Weapons Convention and the Biological Weapons Convention are extremely similar, as are the facts in Bond. Both of those treaties were drafted for identical reasons, and both of the statutes, Section 229 and Section 175, contain the same type of broad language, which is why it's problematic, and why the broad language defining biological toxin could bring in anything from influenza or infecting a sexual partner with HIV. Any of those cases could fall under Section 175. Bond provides some type of limit, and Mr. and that these should have been state, local criminal conduct. They should have been charged under the state of Ohio's criminal code. Also, the government continues to refer to the 500 people that could have been harmed by this. The record indicates that, again, it could only be through the injections, not through inhalation. And really, the fact that the amount of ricin could have hurt 500 people or 256 people is not the question before this court. It's what Mr. Levenderis's intent was based on the evidence in this case, and there was certainly no intent that he had any intent to harm. The intent has to be a specific intent. I think that's what the government had answered when I said this general or specific intent. Maybe I didn't make the question clear, but in order to have an intent to use it as a weapon, that would seem to be a requirement of a specific intent to use it as a weapon. Yes, Your Honor, and also to go to your question, Judge Merritt, about the, or your analogy with the gun, we, just because, you know, there may be evidence that a person kills one other person, but he had 10 bullets in there, there's not suddenly the implication that, well, he could have created, you know, could have caused mass harm just because he had the ability to do so, and the evidence in this case does not suggest any type of mass casualty that would fall under these anti-terrorism statutes. Thank you. Anything further? No. And thank you for accepting the appointment under the Criminal Justice Act, Ms. Mullen, and thank you for your service to the court, and also thank you for appearing on rather short notice for all of you. Good job. I appreciate it. All right, with that, the case will be submitted.